## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>ELECTRONIC MEDIA AND ELECTRONIC<br>STORAGE DEVICES<br>LOCATED AT THE FEDERAL BUREAU<br>OF INVESTIGATION WASHINGTON<br>FIELD OFFICE | Case No. 16-mj_____ |

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR ELECTRONIC DEBVICES SEIZED PURSUANT TO A SEARCH WARRANT

I, Edward E. Moschella, a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the FBI Child Exploitation Task Force (hereinafter the "affiant"), being duly sworn, depose and state as follows:

Your affiant is currently assigned to the Federal Bureau of Investigation (FBI)/MPD Innocent Images Task Force where my duties include investigations pertaining to the sexual exploitation of children and on-line offenses involving children, including the production, transportation, distribution, receipt and possession of child pornography. I have been a Special Agent of the FBI since March, 1997. I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency. Since joining the FBI, I have investigated violations of federal law involving organized crime/drug trafficking organization, violent crime and counterterrorism violations, and I am currently assigned to the Child Exploitation Task Force. I have gained experience through training and work related to conducting these types of investigations. As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

During the course of your affiant's duties as an undercover task force officer ("UC") with

the Child Exploitation Task Force, your affiant posted numerous online bulletin board messages on specific social media forums, which, based on your affiant's experience and information gathered from other sources, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin board messages were intended to attract individuals with a sexual interest in children through the use of adjectives such as "family," "family play," "taboo," and "perv."   Included in these bulletin board messages was your affiant's KIK messenger username.   KIK messenger is a free texting application for mobile devices.

On August 30, 2016, in apparent response to one of the posted bulletin board messages, an individual using the website screen name "Durty Perv" sent your affiant a notification through the website in which your affiant had posted the message.   The message from "Durty Perv" indicated that he was interested in communicating with your affiant.   Specifically, "Durty Perv" responded, "Same" in the subject line and in the text line he wrote, "Only we're divorced, she took my step kids away from me. B and g, 10 and 6, when I started. Greatest fucking sex ever. Looking for a new partner and to adopt."1

On August 31, 2016, your affiant responded to "Durty Perv" via the website messenger, "Cool kik me edferri."   Approximately two hours after sending this response, your affiant was contacted via KIK by an individual using the name KIK user name "1durtyperv" and a screen name of "Durty Perv," who indicated that he was a forty-year-old white male from Cleveland, Ohio, and was subsequently identified as the defendant, JASON BIRK ("BIRK").   After brief introductions, BIRK stated, "Have never had below 5, 7 and up is ideal.   I find different joys a different ages and sexes." Your affiant asked if BIRK had "access," by which your affiant was

---

1   All text abbreviations and typographical errors contained in quoted language are original.

asking BIRK if he had access to children.   BIRK responded, "I do not, it's killing me." BIRK then indicated that he is new to the area in which he is living, and had not found access to children. BIRK talked about his sexual abuse of his stepchildren stating, "I played with the daughter and limited with 1 son."   He then indicated that he had been attempting to locate a woman with kids. BIRK indicated that he was sexually active with his stepdaughter when she was between the ages of 6-13, up until the time he divorced his wife.   BIRK further indicated that he had taken pornographic pictures of his stepdaughter, but had to delete them during the divorce.   BIRK stated that he has limited child pornography on his phone, but has more on a secure hard drive located at his residence.   BIRK then sent your affiant, who was located in the District of Columbia at the time, four images of child pornography, as follows:

- Image 1 depicts a prepubescent female child wearing a red striped shirt.   The child is lying on her back, her legs are spread, and her vagina is exposed and is the focal point of the image.   There appears to be a clear glistening substance on her vagina;

- Image 2 depicts what appears to be a prepubescent female child rubbing an adult penis on her vagina;

- Image 3 depicts a prepubescent female child on her hands and knees, with her anus and vagina exposed and which are the focal point of the image;

- Image 4 depicts a prepubescent female child who appears to be wearing a bikini top, with her nude vagina exposed.   She is holding and adult penis in her hand in close proximity to her mouth.

In addition, BIRK sent to your affiant via KiK a video approximately 1 minute and 32 seconds long depicting a toddler which lying on its side and is being penetrated by an adult penis.

3

In exchange, your affiant sent BIRK an image of his purported stepdaughter's exposed abdomen and underwear.   The image did not depict a real child.   BIRK then inquired of your affiant what he does with his girlfriend's daughter, with whom your affiant purported to have sexual access.   BIRK also asked your affiant, "is girlfriend a perv to?"   Your affiant told BIRK that his purported girlfriend's child is 10 years old and "joins her mother and I in bed."   BIRK indicated, "Nice to see real perv on line…lots of bull s…"   BIRK inquired whether, "Every use substance to alter mom's inhibitions?"   He then continued, "I can remember the first time I sank into my stepdaughter…she could barely take 3" but it was so incredible watching her Cunt stretch around my dick."   Your affiant asked whether BIRK's stepdaughter was "cool with keeping quite [sic]" to which BIRK responded, "Yes.   When I caught her grampa, she didn't want me to tell, she liked it.   As she became more skilled, I used to allow select others to join us for a fee."

BIRK indicated that he was interested in voice chat or a phone call as they are, "More personal than a text."   BIRK then sent your affiant telephone number 330-277-6558.   Metropolitan Police District of Columbia (MPDC) Detective Timothy Palchak, made a telephone call to BIRK, purporting to be "Ed," which your affiant had indicated was his name.   During the call, BIRK indicated that his name was JASON.   BIRK indicated that he grew up in a family who engaged in incestuous relationships.   He then went into detail as to how he started molesting his stepdaughter when she was approximately 6 years old.   He indicated that he caught his stepdaughter's grandfather molesting her, and after discovering this, BIRK assumed the role of abuser.   BIRK went on to say that he engaged in group sex with his step daughter and got off when an adult guided his penis into his step daughter's vagina.   BIRK also indicated that he prostituted his stepdaughter, charging customers $600.00, and shared the proceeds with her.

On or about, September 1, 2016, your affiant conducted a search of FBI databases.   This search revealed that the FBI Office in Canton, Ohio, documented a complaint on September 04, 2012, which alleged that JASON BIRK expressed an interest in finding a juvenile boy with whom to have a sexual encounter.   Investigation revealed that BIRK used the same telephone number, -6558, to communicate with the juvenile in that case.

On September 1, 2016, in response to an administrative subpoena Verizon Wireless indicated that JASON BIRK,                      , Hanoverton, OH is the subscriber of telephone -6558.

On September 8, 2016, a search of the National Sex Offender Registry revealed that JASON BIRK, with a date of birth (DOB)          , is a registered Sex offender in the State of Ohio.   BIRK's registry number is             , and he is registered at a home address Hanoverton, Ohio, 44423, and a telephone number          -6558.

On September 8, 2016, your affiant reviewed a change of address slip submitted to the United States Postal Service dated August 10, 2016, bearing the name of JASON BIRK.    BIRK requested that his mailing address be changed from          , Hanoverton, Ohio, 44423 to , Hanoverton, Ohio, 44423.

On September 9, 2016, your affiant contacted JASON BIRK via KIK Messenger.   During the texting BIRK sent an image which he claimed to be of him.   This image was compared with the BIRK's Ohio driver's license photograph, as well as the images associated with him on the National Sex Offender Registry.   This image sent matches the known images of BIRK.

Between September 9, 2016 through September 22, 2016 numerous surveillances were conducted in the vicinity of BIRK'S residence. During a surveillance on September 22, 2016, a

Detective with the Columbiana Drug Task Force observed and photographed BIRK walk outside of the residence located at                    , Hanoverton, Ohio.

On September 26, 2016, George G. Limbert, United States Magistrate Judge for the Northern District of Ohio, approved a search warrant for BIRK's residence                    , Hanoverton, Ohio.   BIRK lived in the residence with his mother.

On September 27, 2016, an arrest warrant for BIRK was issued out of the United States District Court for the District of Columbia by the Honorable Magistrate Judge G. Michael Harvey, charging BIRK with one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).

On September 29, 2016, after being arrested, BIRK waived his rights and was advised that he had been arrested for distribution of child pornography. During the interview BIRK indicated that many devices found at his mother's residence was were his.  BIRK has since been transported to the District of Columbia, where is he being held without bond on one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).

On January 12, 2017, Elizabeth Stokes, BIRK's mother, was interviewed at her residence by agents with the FBI.  During the interview she was shown a sketch of her residence made by investigating agents on September 29, 2016, during the execution of the search warrant.  The rooms within the residence were labeled by letter.  Stokes verified that Room E, a bedroom depicted in the diagram, had been JASON BIRK'S room at the time of the execution of the warrant, and that Room D was a closet in inside of JASON BIRK'S room, both of which BIRK has access to.  Stokes verified this, first, by indicating it according to a copy of the sketch shown to her by agents with the FBI, and second, she physically showed Agents the Room E and closet therein

(Room D) and stated once again that is was BIRK's room and closet before his arrest. Additionally, Stokes stated that BIRK used and had access to Room G (the garage) and Room A (the living room), but shared access to those rooms with Stokes and BIRK's father. Stokes indicated that any items located in his bedroom (Room E) or the closet therein (Room D) belonged to the defendant. Electronic devices seized from Room D included: (1) 54 optical discs, (2) a Verizon Brand Tablet Model QMV7B bearing FCC ID HFS-QMV7B; and (3) a Lenovo Think Center A70z bearing serial number S1B2201.

## DEFINITIONS/TECHNICAL TERMS

1. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.   In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.   This is usually done with the use of an encryption key, which specifies how the message is to be encoded.   Any adversary that can see the ciphertext should not be able to determine anything about the original message.   An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the

visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.   *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."   *See* 18 U.S.C. § 1030(e)(1).

h.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates a sort of digital key to

"unlock" particular data security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address.   For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.   Domain names are typically strings of alphanumeric characters, with each level delimited by a period.   Each level, read backwards – from right to left – further identifies parts of an organization.   Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department

of Justice.    Additional levels may exist as needed until each machine is uniquely identifiable.   For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet.   The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.   ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.   ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports.   Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.   By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years.   *See* 18 U.S.C. § 2256(1).

11

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).   A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.   The router also distributes to the relevant client inbound traffic arriving from the Internet.   The router is in turn typically connected to a modem.

r.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.   *See* 18 U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.   See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic images.   The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u.      "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as

radio waves.   Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency.   Many wired networks base the security of the network on physical access control, trusting all the users on the local network.   But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it.   A wireless access point is equipment that connects to the modem and broadcasts a signal.   It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.   "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value.   By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty.   There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

2.   As described above and in Attachments A and B, this application seeks permission to search for records that might be found on the electronic media and electronic storage devices, in whatever form they are found.   One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.   As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device

capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.   Thus, the warrant applied for would authorize the search of electronic storage media and digital devices already seized or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

3.    *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are seized, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a. Based upon my training and experience as well as my discussions with others involved in child pornography investigations, computers and computer technology have revolutionized the way in which child pornography is produced, distributed, received and possessed.

b. Individuals who engage in online criminal activity, including Possessing, Receiving or Distributing Child Pornography in violation of Title 18 USC Sections 2252

and 2252A, utilize the internet and computers to allow them to obtain the material in relatively secure and anonymous way.   Individuals who have a sexual interest in child or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer or flash drive.   These collections are often maintained for several years and are kept close by, usually at the collector's residence.   Individuals with a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

c.   Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

d.   Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.   Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather,

15

that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.   In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.   Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."   The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.   Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

4.      *Forensic Evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices seized because:

a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.   Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.   This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward

the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

18

e. Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.   For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I know that when an individual uses a digital device to possess, receive or distribute child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.   The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

5. *Methods To Be Used To Search Digital Devices.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.   There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and

19

software programs necessary to conduct a thorough search.   Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.   As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.   Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.   Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.   As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.   Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.   Consequently, just one device might contain enormous amounts of data.

d.  Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.   For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.   Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.   Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.   For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.   Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.   Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.   Some applications for computers, smart phones, and other digital devices, do not store data

as searchable text; rather, the data is saved in a proprietary non-text format.   Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.   In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."   For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.   Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.  Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.   The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.   Additionally, most smart phones and other mobile devices require passwords for access.   For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.   Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated

22

forensic tools and techniques, or assistance from the phone manufacturer.   Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.   For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.  Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.   Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.   In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review,

will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant.   Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital

24

devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## V.     CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Electronic Media and Electronic Storage devices described in Attachment A to seek the items described in Attachment B.

_____
Edward E. Moschella
Special Agent, Federal Bureau of Investigation

Subscribed and sworn before me this \_\_\_day of January, 2017.

_____
DEBORAH A. ROBINSON
United States Magistrate Judge
 for the District of Columbia